**In re F.A. POTTS AND CO., INC., and G.M.P. Land Company, Inc., Consolidated Debtors.**

**Bankruptcy No. 81–03639 T.**

United States Bankruptcy Court, E. D. Pennsylvania.

Sept. 30, 1982.

Leon S. Forman, Earl T. Stamm, Horace A. Stern, Philadelphia, Pa., Abe H. Frumkin, Pottsville, Pa., for debtors.

Gary Schildorn, Philadelphia, Pa., for Creditors Committee.

Michael H. Reed, Anthony Vale, Philadelphia, Pa., for Ransomes & Rapier, P. L. C.

Richard L. Berkman, Philadelphia, Pa., for Getty Refining and Marketing Co.

Robert H. Kauffman, Reading, Pa., for Nordic Bank.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

The issue before the Court involves the proper allocation of the sale proceeds pursuant to a sale to Anthracorp, Inc., (hereinafter "Anthracorp") of certain interests by F. A. Potts and Company, Inc., (hereinafter "Potts") and by G.M.P. Land Company, Inc. (hereinafter "GMP"). Potts and GMP are the debtors in this recently substantively consolidated Chapter 11 bankruptcy reorganization case. For the reasons hereinafter given, we conclude that the proper allocation of the sale proceeds is that which is set forth in the Purchase Agreement, which was executed by Anthracorp, Potts and GMP on January 8, 1982.[1]

Before examining the procedural history of this case, it is necessary to set forth the salient facts involved in this matter.

Potts is the parent corporation of GMP, its wholly-owned subsidiary. Potts is basically a broker in coal. Potts buys coal chiefly from various groups of independent individual investors who mine the coal on GMP's land pursuant to leases with GMP. Potts then markets the coal.

GMP is basically a land-holding company. GMP owns approximately 16,000 acres of coal-bearing land in Schuylkill County, Pennsylvania. GMP leases portions of its land to the above-mentioned investors, who pay a royalty to GMP for the coal that they mine on GMP's land.

Potts and GMP have always been closely interrelated. Karl Goos is the president of both companies and makes the major decisions for both of them.

On February 1, 1980, Potts entered into a Partnership Joint Venture Agreement with Anthracorp to form an entity known as International Anthracite Associates (hereinafter "IAA"). Both Potts and Anthracorp thereby acquired a one-half interest in IAA. The primary purpose of IAA was to mine and market coal from land leased to it by GMP.

Also on February 1, 1980, IAA entered into a Mining Lease with GMP, pursuant to which IAA obtained the exclusive right to mine the coal from an approximately 550 acre parcel of GMP's land and from an approximately 746 acre parcel of GMP's land. These two parcels are non-contiguous. The 550 acre parcel is known as the B & M Tunnel tract, and the 746 acre parcel is known as the Brookside Slope parcel. This Mining Lease was for an initial term of 20 years and IAA was granted free options to continually extend the Mining Lease thereafter until all of the coal reserves were exhausted. In return for its rights under the Mining Lease, IAA agreed to pay royalties to GMP for all of the coal that IAA mined on the leased property.

On January 8, 1982, subsequent to the commencement of this bankruptcy case, the aforementioned Purchase Agreement was executed by Anthracorp, Potts and GMP. The Purchase Agreement provided for the sale by GMP to Anthracorp of all of GMP's coal and easement rights, free and clear of all liens and encumbrances, in the aforementioned approximately 550 acre B & M Tunnel tract.[2]

The Purchase Agreement also provided for the sale by Potts to Anthracorp of Potts' one-half interest in IAA.

Therefore, by the terms of the Purchase Agreement, Anthracorp acquired full ownership and control of IAA as well as the

---

1. This opinion constitutes the findings of fact and conclusions of law as required by Rule 752 of the Rules of Bankruptcy Procedure.

2. There was some confusion in the evidence as to the acreage of the B & M Tunnel tract and as to whether or not the entire B & M Tunnel tract had been leased from GMP to IAA. In this regard, we are satisfied that the B & M Tunnel tract constitutes approximately 550 acres and that the same (or substantially similar) piece of land was the subject of the lease from GMP to IAA, and subsequently, the subject of the sale from GMP to Anthracorp.

right to mine and remove all of the coal in the B & M Tunnel tract free of any royalty obligation to GMP. Anthracorp did not purchase the surface of the B & M Tunnel tract, however.

According to the terms of the Purchase Agreement, it was a condition precedent to Anthracorp's obligation to consummate the purchase that there be executed an Amended and Restated Mining Lease under which Anthracorp would have the right (formerly held by IAA) to continue to mine on the aforementioned Brookside Slope parcel.

The Purchase Agreement further provided for a purchase price of $7,500,000.00 to be paid by Anthracorp, comprised of $5,600,000.00 in cash and the cancellation of the $1,900,000.00 outstanding amount of a note from GMP to IAA on which judgment had been entered. The cash portion of the purchase price was apportioned $25,000.00 to Potts and $5,575,000.00 to GMP.

The procedural background of this case is also relevant in examining the question before us. Initially, on September 11, 1981, the debtors filed separate voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. On October 2, 1981, the Court ordered the debtors' cases consolidated for the purpose of joint administration only. On September 23, 1982, the Court ordered substantive consolidation of the debtors' cases.

The debtors sought the Court's approval of the aforementioned Purchase Agreement in two separate proceedings. First, they jointly filed a document captioned: "Application of Debtors-In-Possession For Authority To Sell Coal Rights, Grant Easements, And Sell Certain Partnership Interests, To Anthracorp, Inc., At Private Sale, And For Approval Of Amended And Restated Mining Lease" (hereinafter "Application"). Secondly, GMP commenced an adversary proceeding against the entities holding liens on the real estate proposed to be sold by GMP to Anthracorp by filing a document captioned: "Complaint of G.M.P. Land Company, Inc. To Sell Real Property At Private Sale Free And Clear Of Liens And Encumbrances" (hereinafter "Complaint").

Both the Application and the Complaint were opposed by various creditors. The Court, on February 26, 1982 and March 1, 1982, held a hearing on the Application which also constituted a trial on the Complaint. Following extensive testimony regarding the merits of the Purchase Agreement, at the conclusion of the hearing on March 1, 1982, the Court, pursuant to 11 U.S.C. § 363, approved the Purchase Agreement. A written Order confirming the Court's oral decision was entered on March 15, 1982.

During the hearing, on March 1, 1982, the debtors orally amended both their Application and Complaint with respect to the proposed distribution of GMP's share of the cash proceeds from the sale. The debtors proposed to substitute a straight lien-priority method of distribution for their original method of distribution. Therefore, as part of our Order of March 15, 1982, we directed that a new notice be sent to all creditors and parties in interest advising them of the change in the proposed method of distribution and affording them an opportunity to be heard on this matter.

In response to this new notice, the Official Unsecured Creditors' Committee of Potts (hereinafter "Creditors' Committee"), which had objected to the Purchase Agreement before and at the hearing thereon, filed on March 30, 1982 an Objection and Request for Hearing, in which it stated that it "objects to the proposed distribution with respect to that portion of the distribution to be paid to F. A. Potts and Co., Inc. in payment of its partnership interest in International Anthracite Associates..."

The Court, over the objections of the debtors, and those of European-American Banking Corporation (hereinafter "EAB"), a secured creditor of GMP, Citibank, N.A. (hereinafter "Citibank"), a secured creditor of GMP, and Ransomes and Rapier, P.L.C. (hereinafter "R & R"), a guarantor of GMP's obligations to EAB and Citibank, held a hearing on the issue of the allocation of the proceeds of the Anthracorp sale on June 23, 1982. At this hearing, the entire record of the proceedings regarding the An-

thracorp sale was incorporated into the record, including, of course, the testimony received at the hearing of February 26, 1982 and March 1, 1982.

The debtors have filed Memoranda opposing any change in the allocation of the sale proceeds from that which is set forth in the Purchase Agreement. EAB, Citibank, and R & R have jointly filed a Memorandum also opposing any change therein. The Creditors' Committee has filed Memoranda arguing that such allocation should be changed to increase the amount payable to Potts and correspondingly lessen the amount payable to GMP, based upon the evidence which it presented at the hearing of June 23, 1982. The specifics of the Creditors' Committee's position in this regard will be discussed *infra.*

The first issue to be discussed is whether or not the Court should even reconsider that portion of its Order of March 15, 1982 which approved the Purchase Agreement and the attendant allocation of the Anthracorp sale proceeds. The debtors, EAB, Citibank, and R & R have argued vigorously and ably that the Court's Order of March 15, 1982 should constitute the Court's final judicial action on the issue of allocation and that no further evidence on that issue should properly have been considered, the Court having already decided that issue following an evidentiary hearing. In this regard, they argue, of course, that the hearing of June 23, 1982 should not even have been held. Having been held, they still contend that the evidence adduced at the hearing should be disregarded.

On the other hand, the Creditors' Committee, in its Reply Brief, has argued equally vigorously and ably that the Court should, in its sound discretion, reconsider the issue of allocation. In this regard, they point to the case of *Wayne United Gas Co. v. Owens Illinois Glass Co.,* 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937), which stands for the proposition that a Bankruptcy Court

has the power, within its sound discretion, to revise its judgments upon seasonable application and before intervening rights have vested on the faith of its action.

After due consideration of the arguments on this issue, we conclude that we do have the power, in our sound discretion, to reconsider the allocation question and we have chosen to do so.

We believe that it is a very close question as to whether or not we should have so exercised our discretion. An important consideration in so doing was our desire to be as fully informed as possible on the allocation issue, particularly inasmuch as we are not convinced that the evidence regarding the allocation issue was developed quite as thoroughly as it might have been at the sale hearing, given the myriad of other matters then before the Court.

However, having agreed to reconsider the allocation issue and having heard and carefully considered the testimony presented at the hearing of June 23, 1982, we are more convinced than ever that our Order of March 15, 1982 approving the allocation as set forth in the Purchase Agreement is correct.

We now turn directly to the allocation issue. As stated *supra,* the Purchase Agreement allocated the cash proceeds of the Anthracorp sale as follows: $5,575,-000.00 to GMP and $25,000.00 to Potts. We first note that Anthracorp, GMP, and Potts determined the respective interests sold by GMP and Potts to be worth the allocated values. Although this fact is far from determinative, we must at least be mindful of the business judgments of the parties actually involved in the sale.

Furthermore, the evidence presented at the hearing of February 26, 1982 and March 1, 1982 indicated that the allocation set forth in the Purchase Agreement was proper under all the circumstances.[3] This evidence showed that the IAA partnership

---

3. Of course, the Court has already determined in its oral decision of March 1, 1982 and its confirming written Order of March 15, 1982 that the sale itself was fair and reasonable and in the best interests of the debtors, their creditors, and their estate pursuant to 11 U.S.C. § 363.

(and Potts' 50% interest therein) was worthless or worth a minimal value at best.

Karl Goos, the president of both Potts and GMP, testified that the purpose of the formation of IAA by Potts and Anthracorp was to mine red ash coal and export it to France. However, the first trial cargo of coal shipped by IAA to the prospective French purchasers was rejected by them because of the unsatisfactory quality of the coal. (N.T. p. 116, 2/26/82). The mining methods used by IAA also had been faulty. As a result, there was a serious question as to whether or not IAA would even continue to operate. (N.T. p. 116, 2/26/82). Mr. Goos testified further that IAA might need to spend an additional $9,000,000.00 in an attempt to make its mining operations successful. (N.T. p. 117, 2/26/82). He was also very concerned by the fact that IAA already owed Anthracorp nearly $6,000,-000.00 in secured indebtedness and that this indebtedness was payable on a priority basis and carried interest at 2 percent over prime. He thus felt that Potts was faced with the prospect of not recovering any benefit from IAA for a considerable length of time. (N.T. p. 118, 2/26/82). Under all of these circumstances, Mr. Goos began the discussions with Anthracorp which culminated in the Purchase Agreement. (N.T. pp. 118–119, 2/26/82).

As further evidence of the poor financial condition of IAA, the IAA balance sheet showed that IAA had a net operating deficit of $719,316.00 as of December 31, 1981. (Ex. D–6; N.T. p. 122, 2/26/82).

There was no other evidence presented at the hearing of February 26, 1982 and March 1, 1982 pertaining directly to the issue of allocation, although the debtors presented other witnesses who testified competently and credibly regarding the merits of the sale itself.

On the issue of allocation, based upon the hearing of February 26, 1982 and March 1, 1982, we believe that Karl Goos was a competent and credible witness. We further believe that his uncontradicted testimony, along with the IAA balance sheet of December 31, 1981, established that the IAA partnership was of minimal or no value and that, therefore, Potts' 50% interest in IAA was correspondingly of minimal or no value. Thus, this evidence indicates that Potts is properly entitled to no more than the $25,-000.00 which was allocated to it in the Purchase Agreement for its sale of its 50% interest in IAA to Anthracorp.

The evidence presented by the Creditors' Committee at the hearing of June 23, 1982 serves only to reinforce our belief that the allocation set forth in the Purchase Agreement is proper.

The only witness who testified at this hearing was Barry J. Keagy, the president of Ven Coal, Inc., an investment banking firm that works extensively with coal companies. Mr. Keagy testified on behalf of the Creditors' Committee as an expert in the valuation of coal companies. He was retained by the Creditors' Committee to assess the value of Potts' partnership interest in IAA. Mr. Keagy also prepared a report entitled "Valuation Analysis of Partnership Interest in International Anthracite Associates Held by F. A. Potts and Co., Inc.", which was admitted into evidence at that hearing. For reasons which will be discussed *infra,* Mr. Keagy determined that Potts' partnership interest in IAA was worth $4,100,000.00.

According to Mr. Keagy, there are three traditional methods of valuing coal companies-the Adjusted Net Asset Value method, the Present Value of Future Earnings method, and the Comparison with Relevant Sale Transactions method. He determined that the first two methods were inappropriate because IAA was still in a developmental stage at the time of the sale and had not attained profitability. The third method, according to him, was inappropriate in this situation because there have not been any comparable sales of public record.

Therefore, Mr. Keagy felt that the most appropriate method of valuing Potts' partnership interest in IAA was an Imputed Value Analysis. He stated in his report that, according to this Imputed Value Analysis, "the value of the purchase of coal rights from GMP can be readily ascertained

and that value can then be deducted from the total purchase price paid by Anthracorp to determine the imputed value of the partnership interest in IAA held by Potts." (Ex. CC–2, p. 2).

Mr. Keagy determined that the value of the purchase of the coal rights in the B & M Tunnel tract from GMP by Anthracorp is the amount of the royalty income that GMP expected to receive from IAA under the Mining Lease discounted to a net present value at the time of the purchase. Through a series of calculations based upon his reading of the evidence in this case, Mr. Keagy computed this value to be $3,400,000.00. He then subtracted this amount from the total purchase price of $7,500,000.00 (which included the cancellation of the $1,900,000.00 outstanding amount of a note from GMP to IAA) to arrive at $4,100,000.00 as the value of Potts' partnership interest in IAA. Based upon this analysis, therefore, the Creditors' Committee contends that Potts is entitled to $4,100,000.00 of the cash proceeds of the Anthracorp sale, with GMP receiving the remaining $1,500,000.00.

We seriously question whether Mr. Keagy may have undervalued the coal rights sold by GMP to Anthracorp. However, because of a fundamental flaw in Mr. Keagy's Imputed Value Analysis, there is no need to delve any further into that complicated matter. The fundamental flaw is that Mr. Keagy attempted to establish the value of the Potts component of the sale by subtracting the value of the GMP component of the sale from the total purchase price. This analysis is improper unless the total value of what Anthracorp bought is equal to the total price it paid, and neither Mr. Keagy nor anyone else produced evidence establishing this equality of value and price. As logically pointed out in the Debtors' Reply Brief, Mr. Keagy "mixed apples and oranges" by attempting to compute value (apples) by subtracting value (apples) from price (oranges). While we respect Mr. Keagy's expert qualifications and appreciate the difficulty of the task he was confronted with, we cannot accept his Imputed Value Analysis and his attendant conclusions as having any probative value in this case. Put simply, Mr. Keagy did not, in fact, via his Imputed Value Analysis, assess the value of Potts' partnership interest in IAA, as he was specifically retained to do. Moreover, on cross-examination, Mr. Keagy conceded that, in his personal opinion, IAA was worthless. (N.T. p. 66, 6/23/82).[4]

Having rejected Mr. Keagy's Imputed Value Analysis, we are left with the aforementioned evidence from the first hearing which credibly showed that Potts' interest in IAA was of minimal or no value and with Mr. Keagy's expert personal opinion that IAA was worthless. There being no credible evidence to the contrary, we find that Potts' 50% interest in IAA was worth no more than $25,000.00. Therefore, we conclude that the allocation of proceeds between Potts and GMP set forth in the Purchase Agreement is fair and proper, and we shall not disturb our Order of March 15, 1982 regarding said allocation.

---

4. It may be that Anthracorp paid too much for the interests it received from Potts and GMP.

Of course, we would be concerned only if we suspected that the opposite were true.